UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 12cr 10188 |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| QIANG HU a/k/a JOHNSON HU, | ) | 50 U.S.C. § 1705 - Conspiracy |
| | ) | To Commit Export Violations |
| | ) | |
| Defendant. | ) | |

### INDICTMENT

The Grand Jury charges:

#### INTRODUCTORY ALLEGATIONS

**A.   Background**

1.   MKS Instruments, Inc. ("MKS"), is a corporation headquartered in Andover, Massachusetts.  It manufactures and sells several different models of pressure-measuring sensors, which are commonly known as pressure transducers ("pressure transducers").  These products are used in a wide variety of commercial applications, such as solar furnaces and vacuum manufacturing.  They can also be used in gas centrifuges, which are devices for enriching uranium.  More specifically, they are critical to the development of weapons grade uranium and are used to measure gas pressure of uranium hexafluoride in centrifuge cascades.

2.   Because MKS Type 622B, 623B, 626A, 626B, 627B, 722A, and 722B pressure transducers can all be used in nuclear processes, the Department of Commerce requires that MKS obtain a

license to export these pressure transducers to end-users in certain countries, including the PRC. The Department of Commerce requirements are set forth in the Export Administration Regulations, Title 15, Code of Federal Regulations, Parts 730-774. License applications must disclose the names and addresses of all parties to the transaction, including the end-user's. See 15 C.F.R. §§ 748.4(b), 748.5. Based on this and other information, the Department of Commerce decides whether to issue an export license. A license that authorizes the export of an item to one end-user cannot lawfully be used to export the product to a different end-user without the prior authorization of the U.S. government. See 15 C.F.R §§ 750.7 and 750.10

3. At all times material to the Indictment, the Department of Commerce controlled the export of MKS pressure transducers types 622B, 623B, 626A, 626B, 627B, 722A, and 722B under Export Control Classification Number 2B230 and required an export license to ship these parts to the PRC for non-proliferation reasons.

**B.   The Conspirators**

4. QIANG HU a/k/a JOHNSON HU ("HU") is a citizen of the People's Republic of China ("PRC") who lives in Shanghai, China. Since in or about 2008, HU has been the sales manager at MKS's Shanghai sales office, MKS Instruments Shanghai, Ltd. ("MKS-Shanghai").

5. Co-conspirator #1 is a citizen of the PRC who has worked at MKS-Shanghai as a sales engineer since in or about 2006.

6. Co-conspirator #2 is a citizen of the PRC who owns and operates Company A and Company B in Shanghai, China.

7. Co-conspirator #3 is a citizen of the PRC who worked at MKS-Shanghai as the logistics and purchasing manager from in or about 2007 to in or about February 2012.

8. Company C is an entity operating in Shanghai, China.

C. **The Illegal Scheme**

9. HU and others at MKS-Shanghai, including Co-conspirator #1 and Co-conspirator #3, created an illegal scheme for selling pressure transducers to unauthorized end-users in China and elsewhere, i.e. end-users for which true and accurate end-user, end-use, business certificate, and nuclear certification information had not been provided to the Department of Commerce in connection with the sales. The scheme involved sending fraudulent end-user and end-use information to personnel at MKS in Andover, knowing that MKS would unwittingly pass on the fraudulent information to the Department of Commerce in order to obtain export licenses. As a result of the scheme, thousands of export-controlled MKS pressure transducers, worth millions of dollars, were exported from the United States and delivered to unauthorized end-users in the PRC and elsewhere.

10. In the normal course of business, when an end-user in China placed an order for a quantity of pressure transducers with an MKS-Shanghai sales engineer, MKS-Shanghai personnel would prepare an intra-company purchase order that included the purchaser's end-user and end-use information, as well as a copy of the purchaser's business license and a "nuclear certification" in which the end-user certified that the pressure transducers would not be used in certain nuclear processes. MKS-Shanghai personnel would then transmit these documents to MKS personnel in Andover, who would use the information and documents to apply for an export license. The license application would seek authorization to export a fixed number of pressure transducers (e.g., 25, 50, 100, or more) to the end-user over a fixed period of time (normally, two years). Sometimes, the application would seek authorization to export and sell to the end-user more pressure transducers than the quantity the end-user had ordered, in anticipation that the end-user would place additional orders within the two-year period. If the license was granted, a quantity of pressure transducers would then be shipped to Shanghai for delivery to the end-user.

11. Pursuant to the illegal scheme created by the co-conspirators, MKS-Shanghai personnel (including HU, Co-Conspirator #1, and Co-Conspirator #3) routinely transmitted to MKS in Andover phony intra-company purchase orders for pressure

transducers that were accompanied by fraudulent end-user and end-use information, along with fraudulent business licenses and certifications of non-nuclear use, knowing that MKS personnel in Andover would unwittingly use the information and documents to apply for and obtain export licenses from the Department of Commerce. When the purchase orders were filled, MKS-Shanghai personnel caused the pressure transducers to be delivered to the actual end-users, who were not first required to provide true and accurate end-user and end-use information to the Department of Commerce.

12. Pursuant to the illegal scheme, MKS-Shanghai personnel also sometimes used pressure transducers that were in storage awaiting shipment to customers to fulfill orders by other end-users for whom no export license had been obtained. In emails among themselves and with customers, the co-conspirators sometimes used the word "quota" to refer to these stored pressure transducers, as well as to unused quantities remaining on already-obtained export licenses. They sometimes spoke of "borrowing" or "using" this "quota" to fill orders placed by customers.

13. Sometimes the fraudulent end-user, end-use, business license, and nuclear certification information transmitted to MKS in Andover as part of the illegal scheme was taken from actual MKS-Shanghai customers. Other times, it was taken from companies

that were not actual MKS-Shanghai customers but rather companies created by, or associated with, the co-conspirators themselves. These companies include Company A and Company C.

14. Frequently, when sales engineers at MKS-Shanghai sold pressure transducers to end-users who were not first required to provide true and accurate end-user and end-use information to the Department of Commerce, they did not handle the sales themselves, but rather directed the end-users to purchase the pressure transducers from a middleman (usually Co-Conspirator #2 and/or Company A, Company B, or Company C.)  MKS-Shanghai personnel would then provide fraudulently-obtained pressure transducers to the middleman, who would in turn sell them to the end-user.

COUNT 1:        (50 U.S.C. § 1705 - Conspiracy)

The Grand Jury charges that:

The allegations contained in paragraphs 1-14 are hereby re-alleged and incorporated by reference as if fully set forth herein.

From a date unknown to the Grand Jury, but no later than in or about March 2007, and continuing thereafter until the present, in the District of Massachusetts and elsewhere,

**QIANG HU, a/k/a JOHNSON HU,**

defendant herein, did knowingly and willfully conspire, combine, confederate and agree with other persons known and unknown to the Grand Jury to cause the export of U.S. origin goods, that is, pressure transducers (manometer types 622B, 623B, 626A, 626B, 627B, 722A, and 722B), from the United States in violation of the Export Administration Regulations, 15 C.F.R. §§ 736.2(9), 736.2(b)(10), and 764.2, Executive Order 13222, and the International Emergency Economic Powers Act, 50 U.S.C. § 1705.

### OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, the defendant and his co-conspirators committed overt acts, including, but not limited to, the following:

**Fraudulent Export License Process**

(a) On or about October 20, 2009, HU sent a Chinese customer an email in which he explained that even though MKS

7

pressure transducers were export-controlled, MKS-Shanghai would sell pressure transducers to the customer using an export license issued to another end-user. HU copied Co-conspirator #3, the MKS-Shanghai logistics and purchasing manager on this e-mail. HU stated in pertinent part:

> MKS 622A and 226A ... manometers are export controlled products by the U.S. in order to avoid possible usage in military and other sensitive fields. Civil usage is not a problem but needs to apply for export license ahead of time.
>
> Because your previous order(s) is small quantity, our company temporarily borrowed some quota from other customers. With the increased quantity in the future, the export license is a must.

(b) On or about May 5, 2010, HU emailed a Chinese customer regarding a price quote for MKS Type 622B pressure pransducers and copied Co-conspirator #1 and several other MKS-Shanghai employees on the e-mail. In this e-mail, HU advised the customer that, "We informed you 2 days ago that applying for export license by US Dept of Commerce would take some time (about 4 months). In order to solve your problem of delivery cycle and unable to wait for the export license, after our internal discussion, we agree to reallocate some remaining quotas from other" customers.

(c) On or about July 13, 2010, HU emailed a Chinese customer explaining the export license process and how he planned to use the export license issued to another company, Company C, to evade U.S. export regulations. Company C was copied on this

e-mail. HU characterized Company C in the e-mail as MKS-Shanghai's "rep company." In pertinent part, HU stated in this e-mail:

> Manager [manager of new Chinese customer], hello.
> For large quantity of MKS . . . manometer, licenses from Chinese and US Dept of Commerce need to be reapplied. The cycle for such application is rather long. We will send out the relevant document to you ASAP. . . During the application process,. . . we will continue the supply using our rep's quota. Detailed operation steps are as follows: (A) your company will place PO [purchase order] directly with our rep company. . .
>
> Below is the information for our rep company:
> Company Name: [Company C]
>
> Manager ... [manager of Company C], hello.
> Thank you for your great support, so MKS can keep normal business with our important customer during license applying process for the large quantity.

HU concluded the email by stating to both parties, "the export control of the [MKS pressure transducers] has caused extra trouble for all 3 sides. Please understand and provide cooperation actively."

(d) On or about August 13, 2010, Co-conspirator #3 e-mailed the sales staff at MKS-Shanghai, including both HU and Co-conspirator #1, advising the sales employees that they were facing a "severe shortage" in their available export licenses. In this e-mail, Co-conspirator #3 stated in pertinent part:

> Hello, Everyone
>
> Since Engineer [Co-conspirator #1] . . . received 2 large orders, our current usable export license is in severe shortage. We have to describe the end users to

> the Department of Commerce if we want to repeatedly apply export licenses for existing customers. And the fact that customers don't actually buy that many makes it difficult to apply. Therefore I need your help to provide new business licenses especially from the customers listed below. If any of these end users listed below cannot get the export license, please let me know. So I won't keep them in the 'need to apply' list.
>
> [Name of another MKS-Shanghai sales engineer], thank you for providing many business licenses, even the companies that never bought (these parts)
>
> \*\*\*
>
> [Co-conspirator #1], since the quantity is really very large, as we discussed, we can use some of the quota from Hanghong, Shangyu Jingsheng and Shiva Medical (not too many), since these two companies applied with 'description' with Chinese Department of Commerce before, when it comes time for them to confirm the purchase, make sure to tell them to confirm the quantity too, otherwise it will affect us in the future. . . .

**Use of Companies A and B to Evade U.S. Export Laws**

(e)   On or about March 7, 2008, Co-conspirator #1 sent an e-mail to Co-conspirator #2 and a new Chinese customer. Co-conspirator #1 addressed Co-conspirator #2 first, stating, "The following customer needs MKS 72211TBA2FJ Pressure Manometer [pressure transducers]. Please help with the order because of license issues." Co-conspirator #1 next addressed the new customer, stating, "Because this product is a military product, you will need an export license from the U.S. Dept of Commerce. Therefore, this agency company [i.e. Co-conspirator #2 d/b/a Company A] will handle the order. Please understand."

10

(f)  Twenty minutes later, on March 7, 2008, Co-conspirator #2 emailed the new Chinese customer (same as ¶(e) above) and wrote: "I heard that your company wants to purchase MKS72211TBA2FJ Pressure Thin Film Manometer [pressure transducers]. Our company is the agent of MKS in China, and we have export license from the US Dept of Commerce. Please inform us about your quantity and contact information."

(g) From in or about June 2008 through in or about September 2011, the defendant and his co-conspirators caused MKS-Andover to apply for, and obtain, four export licenses from the U.S. Department of Commerce authorizing the sale and export of 193 MKS pressure transducers to Company A, which was identified as the ultimate consignee (end-user).

(h)  On or about December 5, 2008, Co-conspirator #1 sent a reply e-mail to a representative of Parr Lab Technical Solutions ("Parr Labs") and copied Co-conspirator #2 on this e-mail. The subject line of the e-mail read "Re: Urgent requirement of gauge." Co-conspirator #1 wrote: " ... my answer is  1. The goods must ship to China, because of license. . . .  [Also, because] of license [requirement] Mr. [Co-conspirator #2] will handle this case.  Please contact him." Later that day, the Parr Lab's representative e-mailed a response to Co-conspirator #1 and copied Co-conspirator #2.  He wrote: "Our company in UAE (Dubai) [identified in the email as Parr Lab] will release the order, but

if required we will collect our goods from your office. Another option is that the order will be given by the UAE company and the delivery address will be in China." After additional e-mails discussions between the Parr Lab representative and Co-conspirator #2, the Parr Lab representative agreed to order the parts through Co-conspirator #2 at Company A.

(I)  In or about January 2011, HU and his co-conspirators caused 100 pressure transducers (manometer model no. 722B11TGA2FJ) to be exported from Massachusetts to MKS-Shanghai. On or about January 11, 2011, HU and his co-conspirators caused these parts to be delivered to Co-conspirator #2 d/b/a Company B.

(j)  In or about February 2011, HU and his co-conspirators caused 100 pressure transducers (manometer model no. 722B11TGA2FJ) to be exported from Massachusetts to MKS-Shanghai. On or about February 12, 2011, HU and his co-conspirators caused these parts to be delivered to Co-conspirator #2 d/b/a Company B.

All in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 2.

A TRUE BILL

FOREPERSON OF THE GRAND JURY

WILLIAM D. WEINREB
B. STEPHANIE SIEGMANN
Assistant United States Attorneys


DISTRICT OF MASSACHUSETTS, Boston, MA, June 13, 2012


Returned into the District Court by the Grand Jurors and filed.

11:29 AM 6/13/12

Deputy Clerk