UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 12-10188-PBS |
| | ) | |
| QIANG HU a/k/a JOHNSON HU, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT SENTENCING MEMORANDUM**

### I.    PLEA

On October 16, 2013, pursuant to a plea agreement, Qiang Hu a/k/a Johnson Hu ("Hu"),
pled guilty to a one-count Indictment, which charged him with conspiring with other persons
known and unknown to the Grand Jury to cause the export of U.S. origin goods controlled for
nuclear proliferation reasons, that is, pressure transducers (manometer model numbers 622B,
623B, 626A, 626B, 627B, 722A, and 722B), from the United States in violation of the Export
Administration Regulations, 15 C.F.R. §§736.2(9), 736.2(b)(10), and 764.2, Executive Order
13222, and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §1705.

### II.    BACKGROUND

MKS is a global provider of instruments used in advanced manufacturing processes.
MKS manufactures and sells several different types of pressure-measuring sensors (including
manometer model numbers 622B, 623B, 626A, 626B, 627B, 722A, and 722B), which are
sometimes called pressure transmitters but are most commonly known as pressure transducers
("MKS pressure transducers") and are export controlled.  These products are used in a wide
variety of commercial applications, such as solar furnaces and vacuum manufacturing.  They can
also be used in gas centrifuges, which are devices for enriching uranium.  More specifically, they

are critical to the development of weapons grade uranium and are used to measure gas pressure of uranium hexafluoride in centrifuges, which are typically connected to hundreds, if not thousands, of other centrifuges in a parallel format in a single plant.  This type of centrifuge assembly is often referred to as centrifuge cascades.

The MKS pressure transducers are "dual-use" items, that is, items that have both a military and commercial application, and fall under the jurisdiction of the U.S. Department of Commerce.  The Secretary of Commerce has determined that certain MKS pressure transducers model numbers -- 622B, 623B, 626A, 626B, 627B, 722A, and 722B -- are controlled under Export Control Classification Number 2B230 for nuclear proliferation reasons.  The Secretary of Commerce has further determined that export of these items to China requires (and at all relevant times has required) an export license.

MKS-Shanghai is one of many offices that MKS uses to sell products in foreign markets.  MKS-Shanghai is a wholly-owned subsidiary of MKS.  Hu was the sales manager at MKS-Shanghai from 2008 until his arrest in May 2012.  As a result of his employment at MKS-Shanghai, Hu had access to export-restricted MKS pressure transducers.  From approximately 2007 to the present, Hu and others who worked for/with MKS-Shanghai ("MKS-Shanghai conspirators") caused thousands of MKS pressure transducers worth over $6.5 million to be smuggled from the United States and delivered to unauthorized end-users using fraudulently-obtained export licenses.  We will never know the true scope of the national security ramifications of the illegal procurement network in which the defendant was involved because we have been unable to identify all of the unauthorized end-users to which the defendant and his co-conspirators sold the pressure transducers.  We do know, however, that through defendant's illegal procurement network, among other things, hundreds of MKS pressure transducers were

illegally shipped to an Iranian company involved in the procurement of parts for Iran's nuclear centrifuge program. *See* Indictment returned in <u>United States v. Sihai Cheng, et al.</u>, 13-10332-PBS (describing illegal exports of MKS pressure transducers between 2009 and 2012). While there is no evidence that Hu himself knowingly caused parts to be exported to Iran, his conduct and that of his co-conspirators caused thousands of parts with nuclear applications to be exported and delivered to unauthorized persons, including Sihai Cheng, without any restrictions or controls. Accordingly, the illegal exports of MKS pressure transducers to Iran is a reasonably foreseeable act caused by the defendant's criminal conspiracy that should be considered as relevant conduct here. *See* USSG § 1B1.3.

### III.   FACTS

#### A.   Plea

At the Rule 11 hearing, Hu agreed to following statement of facts:

Hu did willfully conspire and agree with Steven Yao, Xiao Lu, Candy Meng, Wang Ping, and others in the PRC to cause the export of U.S. manufactured pressure transducers from the United States.

Hu was the sales manager at MKS's Shanghai office from 2008 to May 2012. Hu's employment gave him access to MKS' export restricted pressure transducers. Hu knew that many of MKS pressure transducers were controlled for export under U.S. export laws and required export licenses to be obtained from the U.S. Government prior to shipping them to China.

To circumvent this export licensing requirement, Hu and his conspirators in China created an illegal scheme for selling pressure transducers to unauthorized end-users in China and elsewhere. The scheme involved sending false end-user and end-use information to personnel at MKS in Andover, Massachusetts, knowing that MKS would then unwittingly pass on the false information to the Department of Commerce in order to obtain export licenses. Sometimes Hu and his conspirators falsely identified the end-users for the fraudulently obtained pressure transducers as legitimate businesses in China for which they were able to obtain business licenses while other times Hu and his conspirators used Wang Ping's company, Shanghai Racy System Integration Co., Ltd., to unlawfully obtain export licenses from the U.S. government. The conspirators also provided MKS

pressure transducers to Wang Ping and Racy System for delivery to unauthorized end-users in China.

During the course of the conspiracy, Hu and his conspirators exchanged numerous emails about how they would illegally obtain MKS pressure transducers, provide false end-use information to MKS employees located in the United States, use export licenses issued to legitimate business to evade US export laws, and arrange for the delivery of the illegally obtained pressure transducers through Ping's front company, Racy System.

As a result of this conspiracy and the illegal activities of Hu and his conspirators, thousands of export-controlled MKS pressure transducers, worth millions of dollars, were exported from the US and delivered to unknown and unauthorized end-users in the PRC and elsewhere.

## B.    The Illegal Scheme

From 2008 until May 2012, Hu worked at MKS-Shanghai.  When Hu was hired, his brother-in-law, Steven Yao was the general manager.  Hu was the sales manager from 2008 until Yao resigned in February 2012.  After Yao's resignation, Hu was promoted to Deputy General Manager of MKS-Shanghai.

Shortly after joining MKS-Shanghai, Hu became involved in an illegal exporting scheme to cause MKS pressure transducers to be illegally exported from the United States to the PRC. Hu conspired with six other Chinese nationals: Steven Yao; Xiao Lu; Candy Meng; Sara Zhou; Lily Lee; and Wang Ping.  Steven Yao (Hu's brother-in-law) was the MKS-Shanghai office manager until his resignation in March 2012.  We believe Yao was the person who first developed the illegal exporting scheme at MKS-Shanghai.  Xiao Lu ("Lu") was a salesman who worked for Hu at MKS-Shanghai from 2006 until May 2012.  Candy Meng ("Meng") was the MKS-Shanghai logistics and purchasing manager until her resignation in February 2012.  Sara Zhou ("Zhou") also worked at MKS-Shanghai in logistics and Lily Lee ("Lee") worked in purchasing and accounting.  Wang Ping ("Ping") is an independent middleman who used two front companies to help Hu and Lu complete illegal export transactions.  The first is a Shanghai-

based company named Racy System Integration Co., Ltd. ("Racy System") and the second is a Hong Kong-based company named Wang Chao International Trade Co., Ltd. ("Wang Chao").

The MKS-Shanghai conspirators used two primary methods to illegally obtain MKS pressure transducers from the United States and deliver them to unauthorized end-users in the PRC. First, they used export licenses that had already been issued to other MKS customers (or legitimate businesses for which MKS-Shanghai had some prior relationship) and then caused the parts to be delivered to Wang, who in turn supplied them to the actual customers, who were not listed on the export license. The conspirators developed an elaborate export license "quota" system in which they used the names and business credentials of legitimate business customers to obtain a large "quota" of available export licenses in order to sell pressure transducers to customers for whom they lacked a license. Typically, if a foreign business anticipates buying a quantity of MKS pressure transducers over time, MKS will apply for a license to export and sell a fixed quantity of parts to that company, (e.g., 50, 100, 200, or more) over a period of time (typically two years).

MKS-Shanghai caused MKS-Andover to apply for many such licenses. Once the export licenses were obtained, MKS-Shanghai would then submit fraudulent intra-company purchase orders to MKS-Andover. After MKS-Andover confirmed that an export license had been obtained for the customer MKS-Shanghai had falsely listed on the purchase order, MKS-Andover then exported the parts to MKS-Shanghai not knowing that MKS-Shanghai would in turn sell the parts to an unauthorized end-user in the PRC. When the pressure transducers arrived in the PRC, rather than delivering them to the companies named in the export licenses, the MKS-Shanghai conspirators typically delivered them to Ping (their middle-man) and his front companies (such as Racy System), which in turn supplied them to the actual customers.

Second, Hu and Lu caused MKS-Andover to apply for licenses authorizing the sale and export of approximately 200 MKS pressure transducers to Racy System (a Ping front company), which they then re-sold to the actual customers.  Hu and Lu did this by supplying MKS-Andover with documents indicating that Racy System was a legitimate company that would use the parts to manufacture medical plasma cleaning systems.

This elaborate illegal export scheme required the MKS-Shanghai conspirators to keep two sets of books.  One set of books was only shared internally with the other conspirators. Those books showed the company or person to whom they were actually selling the parts, which they used to keep track of where the parts should be shipped upon receipt from MKS-Andover. The real books also listed the export license they were using for each sale and price they were charging the customer.  Unbeknownst to MKS-Andover, the MKS-Shanghai conspirators charged prices far above the MKS-Shanghai list prices.   On average, the MKS-Shanghai conspirators were charged a 40% markup on their illegal sales.  The other set of books, the phony books, were shown to any U.S. representatives from the MKS-Andover office when they performed audits.  The later contained phony sales records that made it appear as if the parts were only going to authorized end-users who had obtained an export license.

C.      Hu's Role in the Offense

Hu was a manager and leader of the illegal export activity at MKS-Shanghai and this activity was extensive in scope under USSG §3B1.1(a).  While Hu served as the Sales Manager at MKS-Shanghai, the majority of the employees at that office, including himself, were involved in an elaborate scheme to circumvent U.S. export laws and sell products with nuclear applications to unauthorized end-users in the PRC and elsewhere.  By deceiving MKS-Andover

employees and the United States government, Hu and others at MKS-Shanghai caused thousands of pressure transducers worth over six million dollars to be exported and sold to unknown entities that did not obtain the requisite export license or certify that the parts would not be used for nuclear applications.  Although the illegal scheme did not originate with Hu (it had been established before Hu joined MKS-Shanghai by Yao), there is no question that Hu was involved in, and approved of, this illegal activity and, as sales manager, directed employees to take actions that violated U.S. law.  Below are three emails that demonstrate the managerial role Hu played in the charged conspiracy.

(a)     On February 12, 2009, in response to inquiries from a customer who claimed to be seeking parts for an end-user in the United Arab Emirates, Hu instructed Xiao Lu via e-mail to "forward this enquiry (sic) to wangpin[g] for following up in order to avoid any possible problem.  Pls (sic) explain the reasons to Vikas regarding what we are going to do."  Because of the suspicious nature of this transaction, rather than dealing directly with Vikas, Hu chose to have Vikas place the order with Wang Ping's front company who would in turn order the parts from MKS-Shanghai.

(b)     In response to a question from one of the sales engineers Hu supervised, on January 7, 2010, Hu instructed that sales engineer via e-mail that in order to make it "safe and easy to apply for export license" for a particular order, he should use "a company who has a long-term business relationship with MKS." Hu further advised that the sales engineer to "communicate with Xiao Lu as to which company you use to provide quote."

(c)      On May 28, 2010, Hu informed a new customer via e-mail that

rather than having his company apply for an export license, "we discussed and

agreed internally to transfer left over quota from" another export license.  Hu

copied Yao and Lu on this e-mail.

Additionally, when Yao left the company in February 2012, Hu was promoted to Deputy

General Manager and in charge of the MKS-Shanghai office.  After this promotion, Hu chose to

continue the illegal activity and therefore, the MKS-Shanghai staff, under Hu's direction and

control, continued to prepare phony intra-office invoices to illegally obtain export licenses and

sell pressure transducers to unauthorized end-users who had not obtained an export license.

The charged illegal activity involved at least five other participants.  Indeed, at the Rule

11 hearing, Hu conceded that he conspired with Steven Yao, Xiao Lu, Candy Meng, Wang Ping,

and others in the PRC.  Six sales engineers (including Lu) worked for Hu at MKS-Shanghai and

assisted Meng in obtaining fraudulent U.S. export licenses from 2008 until February 2012.  After

Hu was promoted in February 2012, almost all of the MKS-Shanghai employees worked for him.

Because of Hu's managerial role and the extensive nature of this criminal scheme, a four-level

enhancement under USSG § 3B1.1(a) is justified.  If the Court finds the Hu was not a leader of

the criminal activity, the Court should at minimum give Hu a three-level enhancement under

USSG § 3B1.1(b) as he was a manager of at least one person (*i.e.* the sales engineers) and the

illegal scheme was extensive.  *See United States v. Joyce*, 70 F.3d 679, 683 (1st Cir. 1995)

(three-level adjustment under § 3B1.1(b) is warranted when a defendant exercised control over,

or was responsible for overseeing the actions of, at least one other criminally responsible

participant).

## CONCLUSION

As a result of the conspiracy and illegal activities of Hu and his conspirators, thousands of MKS pressure transducers worth more than 6.5 million dollars were smuggled from the United States and delivered to unknown and unauthorized end-users in the PRC and elsewhere for profit.  Because these products have nuclear applications, such conduct has greatly jeopardized our national security.  Indeed, as a result of this conspiracy, Iran illegally obtained hundreds of MKS pressure transducers for their uranium nuclear enrichment facility at Natanz. While there is no evidence that Hu himself knowingly caused parts to be exported to Iran, his conduct and that of his co-conspirators caused thousands of parts with nuclear applications to be exported and delivered to unauthorized persons, including Sihai Cheng, without any restrictions or controls.  In November 2013, Cheng was indicted for causing MKS pressure transducers to be illegally exported from the United States to Iran through the PRC.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:      /s/ B. Stephanie Siegmann
         B. STEPHANIE SIEGMANN
         Assistant U.S. Attorney

Certificate of Service

I hereby certify that I caused the above document to be served on counsel by filing it electronically with the Court via the ECF system on July 18, 2014.

*/s/ B. Stephanie Siegmann*
_____
B. Stephanie Siegmann